IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling

OHIO COUNTY COMMISSION, et al.,

                Plaintiffs,

v.                                  **Civil Action No. 5:24-CV-142**
                                  Judge Bailey

EXPRESS SCRIPTS, INC., et al.,

                Defendants.

## ORDER

Pending before this Court is Defendants' Motion to Dismiss for Failure to State a Claim [Doc. 108], filed October 11, 2024. Plaintiffs filed a Response in Opposition [Doc. 131] on November 15, 2024. Defendants filed a Reply [Doc. 135] on December 6, 2024. This matter is now ripe for adjudication. For the reasons that follow, this Court will grant in part and deny in part defendants' Motion to Dismiss.[1]

This Court will first note that on November 13, 2024, this Court granted plaintiffs' request to file their Second Amended Complaint. *See* [Doc. 127]. Plaintiffs filed their Second Amended Complaint on November 14, 2024. *See* [Doc. 128]. Although the instant Motion to Dismiss was filed before the operative Second Amended Complaint, this Court will consider the instant Motion ripe because the new Second Amended Complaint only

---

[1] This Court will also defer ruling on plaintiffs' First Claim for Relief pending argument on the certified question in ***City of Huntington and Cabell County Commission v. AmerisourceBergen Drug Corp., et al.***, No. 22-1819 [Doc. 137 at 4] (4th Cir. Mar. 18, 2024).

added a new plaintiff, the City of Charleston, and did not otherwise broaden the scope of the allegations. *See **Bell v. CSX Transp., Inc.***, 2024 WL 2055250, at *1 n.1 (D. Md. May 8, 2024) (Bredar, J.). Moreover, the City of Charleston "is making itself subject to Defendants' motions to dismiss" and therefore, the arguments raised by the parties in their motion to dismiss briefing retain their full force and this Court is not in need of any additional briefing. *See* [Doc. 126-1 at 6].

Because the Second Amended Complaint [Doc. 128] is the operative complaint in the above-styled case, this Court will cite to and reference the Second Amended Complaint throughout this Order.

## I.    Background

Plaintiffs, a collection of cities, towns, and counties in West Virginia, assert claims for common law public nuisance; violation of Federal Civil RICO, 18 U.S.C. §§ 1961, *et seq.*; 1964(C); negligence; civil conspiracy; and unjust enrichment. *See* [Doc. 128 at 8, ¶¶ 855–1007]. Plaintiffs allege that defendants "for at least the last two decades, played a central role in causing the oversupply of opioids in Plaintiffs' Communities through actions intended to avoid safeguards in order to increase the prescribing, dispensing, sale and supply of prescription opioids in Plaintiffs' Communities." [Id. at ¶ 5]. Plaintiffs assert that "[t]his case arises from that devastating epidemic of human creation—the over-prescription, over-supply, misuse, diversion, and abuse of opioids–and the central role that two of the nation's largest Pharmacy Benefit Managers ('PBMs'), Express Scripts and OptumRx, and their affiliates, have played in that epidemic." [Id. at ¶ 3].[2]

_____

[2] In the Second Amended Complaint, plaintiffs provide a list of the defendants and break them into two groups: Express Scripts and Optum. *See* [Doc. 128 at ¶ 4]. Plaintiff

Plaintiffs request this Court to enter judgment against defendants, jointly and severally, and award all such relief as this Court deems appropriate and just, including: (a) Abatement of nuisance; (b) Actual damages; (c) Treble or multiple damages and civil penalties as allowed by statute; (d) Punitive damages; (e) Disgorgement of unjust enrichment; (f) Equitable and injunctive relief in the form of Court-enforced corrective action, programs, and communications; (g) Forfeiture disgorgement, restitution and/or divestiture of proceeds and assets; (h) Attorneys' fees; (i) Costs and expenses of suit; and (j) Pre- and post-judgment interest. [Id. at 342–43].

## II.    Standard of Review

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (applying the *Twombly* standard and emphasizing the necessity of *plausibility*).  When reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must assume all of the allegations to be true, must resolve all doubts and inferences in favor of the plaintiff, and must view the allegations in a light most favorable to the plaintiff. *Edwards v. City of Goldsboro,* 178 F.3d 231, 243–44 (4th Cir. 1999).

When rendering its decision, the Court should consider only the allegations contained in the Complaint, the exhibits to the Complaint, matters of public record, and other similar materials that are subject to judicial notice.  *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995). In *Twombly*, the Supreme Court, noted

_____

then notes that together Express Scripts and Optum are referred to as "the PBM Defendants."

that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . ." **Twombly**, 550 U.S. at 555, 570 (upholding the dismissal of a complaint where the plaintiffs did not "nudge[] their claims across the line from conceivable to plausible.").

This Court is well aware that "[M]atters outside of the pleadings are generally not considered in ruling on a Rule 12 Motion." **Williams v. Branker**, 462 Fed.App'x. 348, 352 (4th Cir. 2012). "Ordinarily, a court may not consider any documents that are outside of the Complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." **Witthohn v. Fed. Ins. Co.**, 164 Fed.App'x. 395, 396 (4th Cir. 2006). However, the Court may rely on extrinsic evidence if the documents are central to a plaintiff's claim or are sufficiently referred to in the Complaint. **Id**. at 396–97.

## III.    Analysis

### A.    Timeliness

Defendants first argue that four (4) claims asserted by plaintiffs are untimely: violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), negligence, civil conspiracy, and unjust enrichment. *See* [Doc. 109 at 15–18]. Defendants assert two (2) plaintiffs, the City of Huntington and Cabell County, who were represented by the same counsel as here, previously pressed these same claims in 2019, when they filed an amended complaint against "PBM Defendants," including Express Scripts, Inc., Express Scripts Holding Company (n/k/a Evernorth Health, Inc.), Optum, Inc., and OptumRx, Inc. [Id. at 15 (citing **Cabell County Commission & City of Huntington v. Purdue Pharma,**

*L.P., et al.*, Nos. 1:17-op-45053 & 1:17-op-45054 (N.D. Ohio) [Doc. 80 in 1:17-op-45054 at ¶¶ 284–300])]. That complaint was filed publicly on September 16, 2019. *Cabell County Commission & City of Huntington*, Nos. 1:17-op-45053 & 1:17-op-45054 (N.D. Ohio) [Doc. 80 in 1:17-op-45054]. Defendants further state that the City of Huntington separately sued Express Scripts, Inc. and Express Scripts Holding Company in March 2018 for negligence and unjust enrichment. *City of Huntington, et al. v. Express Scripts Holdings Co., et al.*, No. 1:18-op-45984 (N.D. Ohio) [Doc. 7-1].[3]

Defendants argue plaintiffs knew, or should have known, of their claims by September 2019 at the latest. Defendants assert that a 2019 accrual date is consistent with plaintiffs' allegations that defendants' wrongful conduct spanned "from the late 1990s through 2018," [Doc. 128 at ¶ 381], and that plaintiffs have for decades been injured by the volume of prescription opioids in their communities. *See, e.g.* [Doc. 128 at ¶ 806 ("massive overshipment" between 2006 and 2014); ¶ 809 (harm has occurred "[f]or over a decade")].

In Response, plaintiffs argue defendants have not, and cannot, meet their Rule 12(b) burden of establishing dismissal is warranted on those grounds. *See* [Doc. 131 at 15]. Plaintiffs further argue that resolution of a limitations defense involves fact questions that preclude resolution on a 12(b)(6) motion. [Id. at 15–16 (citing Syl. Pt. 5, *Dunn v. Rockwell*, 225 W.Va. 43, 46, 689 S.E.2d 255, 265 (2009) for the proposition that West Virginia law applies a five-step approach to the limitations analysis and only the first question, identifying the applicable statute of limitation for each cause of action, is purely

---

[3] The Complaint was originally filed in March 2018 in the Circuit Court of Kanawha County, West Virginia, and was removed to the Northern District of Ohio on April 16, 2018. *See City of Huntington, et al.*, No. 1:18-op-45984 (N.D. Ohio) [Docs. 7 & 7-1].

a question of law; the remaining steps typically involve questions of material fact that must be resolved by the trier of fact)].

In Reply, defendants re-assert that plaintiffs' RICO, negligence, unjust enrichment, and conspiracy claims are untimely because plaintiffs did not file suit until at least five (5) years after they became aware of their claims. [Doc. 135 at 10]. Defendants contend that dismissal is warranted as a matter of law where, as here, "it appears on the face of the complaint that the limitation period has run." [Id. (quoting *Yoe v. Branch Banking & Tr. Co.*, 2014 WL 713283, at *6 (N.D.W. Va. Feb. 25, 2014) (Groh, J.) (dismissing untimely claims at 12(b)(6) stage), *aff'd*, 585 Fed.App'x 178 (4th Cir. 2014))]. Defendants argue that "there are no fact questions to resolve as Plaintiffs' own allegations and prior lawsuits show that Plaintiffs knew or should have known of their claims by 2019 at the latest." [Id. at 11].

In deciding defendants' Motion to dismiss based on the statute of limitations, this Court should only grant the Motion if it clearly appears on the face of the Second Amended Complaint that plaintiffs' claims are time-barred. *Goodman v. Praxair*, 494 F.3d 485, 464 (4th Cir. 2007). In *Goodman*, the Fourth Circuit stated:

> Ordinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense . . . and the burden of establishing the affirmative defense rests on the defendant. It follows, therefore, that a motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred. But in the relatively rare circumstances where facts

6

sufficient to rule on an affirmative defense are alleged in the complaint, the

defense may be reached by a motion to dismiss filed under Rule 12(b)(6).

**This principle only applies, however, if all facts necessary to the**

**affirmative defense "clearly appear [ ] on the face of the complaint.**"

*Id*. (emphasis added) (citations omitted); *see also* **Richmond, Fredericksburg &**

**Potomac R.R. v. Forst**, 4 F.3d 244, 250 (4th Cir. 1993) ("A motion under Rule 12(b)(6) is

intended to test the legal adequacy of the complaint, and not to address the merits of any

affirmative defenses.").

Given this principle, this Court rejects defendants' position that plaintiffs' claims are

barred on their face.  Although plaintiffs' Second Amended Complaint alleges facts that

may warrant application of the continuing tort/separate accrual rule, the discovery rule,

fraudulent concealment and/or equitable estoppel, plaintiffs are not required to rebut the

affirmative defense of the statute of limitations in their Second Amended Complaint.

*Goodman*, 494 F.3d at 465–6 ("[w]hile [ plaintiff] might ultimately have to prove when he

discovered a breach, he was not obligated to plead discovery of the breach in his

complaint...."). These arguments are better reserved for summary judgment (or trial).

*Richmond, F. & P. R.R. Co.*, 4 F.3d at 250 (holding that because the asserted statute of

limitations defense does not appear on the face of the third-party complaint, "it is

inappropriate to address it in the current posture of the case [ ]" and noting that this

defense is "more properly reserved for consideration on a motion for summary judgment.").

Upon construing all factual allegations in favor of plaintiffs, this Court cannot

conclude that their claims are time-barred as a matter of law. The question of whether the

statute of limitations bars the plaintiffs' claims is more appropriately addressed in a motion for summary judgment or at trial. Accordingly, defendants' Motion to Dismiss is **DENIED** with respect to the issue of timeliness.

### B.    Second Claim for Relief: RICO

In the Second Claim for Relief, plaintiffs allege a civil violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act § 1961 *et seq.*:

> the PBM Defendants formed an association-in-fact enterprise with each of the Opioid Enterprise Manufacturers,[4] described above as the Formulary & UM Enterprise, for the purpose of carrying out a fraudulent scheme and felonious possession and dispensing of controlled substances to maximize profits for themselves and the Opioid Enterprise Manufacturers from increasing sales of prescription opioids through unfettered and preferential formulary access without UM in the PBM Defendants'[5] standard offerings, despite the PBM Defendants' promises, representations and contractual

---

[4] Allergan, Johnson & Johnson/Janssen, Endo, Insys, Mallinckrodt, Purdue, and Teva/Cephalon are referred to collectively as the "Opioid Enterprise Manufacturers" in the Second Amended Complaint. *See* [Doc. 128 at ¶ 701].

[5] The "PBM Defendants" are referred to as Express Scripts, Inc.; Express Scripts Administrators, LLC; Medco Health Solutions, Inc.; ESI Mail Order Processing, Inc.; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts Specialty Distribution Services, Inc.; Express Scripts Sales Operations, Inc.; Evernorth Health, Inc. (formerly Express Scripts Holding Company); Evernorth Care Solutions, Inc.; Evernorth Direct Health, LLC; Evernorth Behavioral Health, Inc.; Evernorth Sales Operations, Inc.;UnitedHealth Group, Inc.; Optum, Inc.; OptumInsight, Inc. f/k/a Ingenix, Inc.; OptumInsight Life Sciences, Inc. f/k/a QualityMetric, Inc.; OptumRx, Inc.; OptumRx Discount Card Services, LLC; Optum Perks, LLC; OptumHealth Care Solutions, LLC; OptumHealth Holdings, LLC; and Optum Health Networks, Inc. in the Second Amended Complaint. *See* [Doc. 128 at ¶ 4].

> obligations to take actions, including through cDUR, formulary decisions and UM decisions that were in their clients' best interests, to ensure safe and medically appropriate opioids were being dispensed, and to address opioid abuse, misuse and diversion.

[Doc. 128 at ¶ 925].

Defendants' Motion first argues plaintiffs may not seek equitable relief under the RICO statute. [Doc. 109 at 18 (citing *Hengle v. Treppa*, 19 F.4th 324, 353–56 (4th Cir. 2021))]. Defendants next argue that plaintiffs fail to satisfy the RICO statute's requirements because plaintiffs have not plausibly alleged: (1) an injury to business or property [Doc. 109 at 18–20] and (2) proximate cause [id. at 20–22]. Lastly, defendants argue plaintiffs have failed to plausibly allege the elements of a RICO claim. *See* [id. at 22–26].

With respect to defendants' first argument that plaintiffs may not seek equitable relief under the RICO statute, plaintiffs state in Response:

> Plaintiffs recognize that the Fourth Circuit has held that private plaintiffs cannot sue for injunctive or declaratory relief under the RICO statute. *Hengle v. Treppa*, 19 F.4th 324, 353–57 (4th Cir. 2021). The court acknowledged, however, that the circuits are split on this issue. *Id*. Plaintiffs preserve their right to argue on appeal that Hengle's ruling is incorrect.

[Doc. 131 at 20 n.10]. Regardless of the ruling in *Hengle*, plaintiffs argue they have sufficiently alleged their RICO claims for damages. [Id. at 20–29].

In Reply, defendants state that plaintiffs concede that under Fourth Circuit precedent they "may sue only for treble damages and costs." [Doc. 135 at 13 (citing *Hengle v. Treppa*, 19 F.4th 324, 354–56 (4th Cir. 2021))]. Defendants further argue that plaintiffs have not plausibly alleged: (1) a RICO injury to business or property, (2) a direct injury, and (3) the existence of a RICO enterprise or that defendants joined and managed or operated an enterprise. [Doc. 135 at 13–18].

RICO's civil remedies section provides, in pertinent part:

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in . . . ; or ordering dissolution or reorganization of any enterprise . . . .

(b) The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

10

18 U.S.C. § 1964(a)–(c).  As articulated by the Fourth Circuit:

> Section 1964(a) authorizes district courts to employ a broad range of equitable remedies to prevent and restrain violations of RICO's substantive provisions. *Cf.* ***Steel Co. v. Citizens for a Better Env't,*** 523 U.S. 83, 90 (1998) (explaining that a similarly worded provision "specif[ies] the remedial powers of the court"). But this provision, by itself, says nothing about who may invoke the court's remedial powers.

> Subsections (b) and (c) create the causes of action specifying who may sue for which forms of relief.  Section 1964(b) provides that the Attorney General "may institute proceedings under this section"—a clear cross-reference to the broad remedial powers authorized in Section 1964(a). It also specifies that district courts may order interim forms of equitable relief while the Attorney General's "proceedings under this section" are pending.

> In contrast, Section 1964(c), which applies to private litigants, does not refer to the remedial powers authorized in Section 1964(a). *See* [***Religious Tech. Ctr. v.***] ***Wollersheim***, 796 F.2d [1076,] 1082 [(9th Cir. 1986)] ("In contrast to part (b), there is no express authority [in part (c)] to private plaintiffs to seek the equitable relief available under part (a).").  It instead creates a cause of action for private parties injured by violations of Section 1962 to "sue therefor" and "recover ... damages." 18 U.S.C. § 1964(c).  By authorizing the government to "institute proceedings under" Section 1964 and not giving private plaintiffs the same authority, Congress

11

expressed its intent to withhold from private plaintiffs the ability to invoke the injunctive power granted to the courts in Section 1964(a). We accordingly cannot agree with the Seventh Circuit that the opening sentence of Section 1964(b), authorizing the Attorney General to "institute proceedings under this section," and the opening clause of Section 1964(c), authorizing plaintiffs injured by RICO violations to "sue therefor," are "equivalent." [*Nat'l Org. For Women v.*] *Scheidler*, 267 F.3d [687,] 697 [(7th Cir. 2001)]. We refuse to read such material differences out of the statutory text.

As this Court has previously observed, Section 1964(c) "makes no mention whatever of injunctive or declaratory relief." *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 726 (4th Cir. 1999); *see also Dan River, Inc. v. Icahn*, 701 F.2d 278, 290 (4th Cir. 1983) (observing that Section 1964(c) "has nothing to say about injunctive relief," in "sharp contradistinction to" Section 1964(b)). Of course, that subsection also does not expressly limit private plaintiffs to the treble damages and costs authorized there. But Congress's use of significantly different language to create the governmental right of action in Section 1964(b) and the private right of action in Section 1964(c) compels us to conclude by negative implication that, although the government may sue for prospective relief, private plaintiffs may sue only for treble damages and costs.

For similar reasons, we cannot agree with the Seventh and Second Circuits that Section 1964(a) by itself authorizes private parties to seek

12

equitable relief. Those courts reason that Section 1964(b) "mentions only interim remedies," *Scheidler*, 267 F.3d at 696, so the government's authority to seek permanent injunctions must proceed from Section 1964(a) alone and, "[b]y parity of reasoning," Section 1964(a) must also authorize private parties to seek equitable relief, [*Chevron Corp. v.*] *Donziger*, 833 F.3d [74,] 138–139 [(2d Cir. 2016)]. But a flawed premise leads to a flawed conclusion. It is Section 1964(b)'s cross-reference to Section 1964(a) that authorizes the government to seek permanent injunctions. *See* 18 U.S.C. § 1964(b) ("The Attorney General may institute proceedings under this section." (emphasis added)). Section 1964(c) tellingly contains no similar language or any other reference to equitable relief. Because we reject the Seventh and Second Circuits' restrictive reading of Section 1964(b), we also necessarily reject their conclusion that Section 1964(a) by itself authorizes private parties to seek injunctive relief.

Our reading of the statute does not reduce Section 1964(a) to a merely jurisdictional provision. *See Donziger*, 833 F.3d at 138; *Scheidler*, 267 F.3d at 697. Instead, it honors the distinct text Congress used in each subsection—describing courts' remedial powers under RICO in (a) and creating two different causes of action with corresponding remedies for two different categories of plaintiffs in (b) and (c). Further, while we recognize that RICO's "terms are to be 'liberally construed to effectuate its remedial purposes,' " *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting

Section 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961), even a liberal construction of Section 1964 cannot import into the statute a remedy that Congress has chosen not to provide.

*      *      *

Because the text of Section 1964 is unambiguous and the statutory scheme is coherent and consistent, "[o]ur inquiry must cease." ***Robinson v. Shell Oil Co.***, 519 U.S. 337, 340 (1997); *see also* ***Alexander v. Sandoval***, 532 U.S. 275, 288 n.7 (2001) ("[T]he interpretive inquiry begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action." (internal citation omitted)). The Tribal Officials and the United States as amicus curiae point out that, on at least two occasions, Congress declined to pass legislation that would have added to RICO an explicit right for private plaintiffs to seek injunctive relief, and the Fifth and Ninth Circuits have found this history persuasive. *See* [***In re Fredeman Litig.***], 843 F.2d [821,] 829–830 [(5th Cir. 1988)]; ***Wollersheim***, 796 F.2d at 1084–1086. Although we agree with those courts that Congress has not authorized private RICO plaintiffs to seek injunctive relief, *see*, [***In re Fredeman Litig.***] 843 F.2d at 830; ***Wollersheim***, 796 F.2d at 1084, we do so based on the text of the statute and without considering these failed legislative proposals, which "are 'a particularly dangerous ground on which to rest' " statutory interpretation, ***Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs***, 531 U.S. 159, 169–170 (2001)

14

(quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994)). Congress's intention is revealed in the text of the statute it enacted, and for the reasons explained here, Section 1964 does not authorize private RICO plaintiffs to sue for prospective injunctive relief.

*Hengle*, 19 F.4th at 353–55, 356.

Although the *Hengle* decision acknowledges that "[o]ur sister circuits are evenly divided on this question," as pointed out by the plaintiffs and clearly established by the Fourth Circuit, "RICO does not authorize private plaintiffs to sue for injunctive relief." *See* 19 F.4th at 357. Private plaintiffs may sue only for treble damages and costs. *Id.* at 354. In adherence to the Fourth Circuit's precedent, this Court will **GRANT** defendants' Motion as it pertains to plaintiffs' RICO claim for injunctive relief. Thus, plaintiffs' RICO claim is hereby **DISMISSED** from the Second Amended Complaint to the extent that it seeks injunctive relief. Plaintiffs are permitted to pursue only treble damages and costs. Nevertheless, plaintiffs retain the right to challenge, on appeal, the correctness of the *Hengle* decision and, by extension, this Court's ruling.

### C.    Preemption

Defendants argue that several federal statutes—including the Employee Retirement Income Security Act of 1974 ("ERISA") and Medicare Part D—preempt plaintiffs' state law claims. This Court will address both ERISA and Medicare Part D in turn.

### i.    ERISA

Defendants argue that plaintiffs' state-law claims "are preempted as to ERISA plans because they seek to impose 'a certain scheme of substantive coverage' in a single state, . . . namely rules governing the provision of certain drugs under ERISA plans. [Doc. 109 at 36 (citing **Rutledge v. Pharm. Care Mgmt. Ass'n**, 592 U.S. 80, 86 (2020))].

In Response, plaintiffs argue that to the extent their claims concern defendants' conduct with respect to plans that fall outside ERISA's scope (e.g., governmental plans; church plans; individual plans offered by insurers, such as ACA exchange plans; etc.), such claims are not preempted by ERISA. [Doc. 131 at 40].

In Reply, defendants contend plaintiffs' claims are preempted because they seek to dictate the prescription drug benefits offered under ERISA plans and to impose liability for those benefit choices. [Doc. 135 at 24].  Because plaintiffs are bringing claims that challenge the placement of "opioid drugs on formularies with preferred status," defendants argue plaintiffs' claims are preempted by ERISA with respect to ERISA plans that defendants service.

ERISA, 29 U.S.C. §§ 1001 *et seq.*, regulates employee benefit plans. **Aetna Health Inc. v. Davila**, 542 U.S. 200, 208 (2004).  Congress intended ERISA to "ensure that plans and plan sponsors would be subject to a uniform body of benefits law" by "establish[ing] the regulation of employee welfare benefit plans as exclusively a federal concern." **N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.**, 514 U.S. 645, 656 (1995) (quotations omitted).

16

The provisions of ERISA "supersede any and all State laws insofar as they . . . relate to any employee benefit plan. . . ." 29 U.S.C. § 1144(a).  This includes "all state common law causes of action. . . ." *Olson v. Gen. Dynamics Corp.*, 960 F.2d 1418, 1420 (9th Cir. 1991) (citing 29 U.S.C. § 1144(c)(1)).  While the language of ERISA's express preemption clause is broad, "the need for workable standards has led the U.S. Supreme Court to reject 'uncritical literalism' in applying the clause." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans*, 514 U.S. at 656).  Accordingly, the Court has instructed that ERISA preempts "two categories of state laws." *Id.* at 319.  "First, ERISA pre-empts a state law if it has a 'reference to' ERISA plans[,]" that is, "where a State's law acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation." *Id.* at 319–20.  "Second, ERISA pre-empts a state law that has an impermissible 'connection with' ERISA plans, meaning a state law that governs [ ] a central matter of plan administration or interferes with nationally uniform plan administration." *Id.* at 320 (internal quotations and citations omitted).

ERISA does not preempt plaintiffs' suit under either of these two prongs.  Under the first "reference to" prong, state law is preempted where "the existence of ERISA plans is essential to the law's operation" or if "the existence of [an ERISA-covered] plan is a critical factor in establishing liability" and there would be "no cause of action if there [was] no plan." *Id.* at 319–20; *see also Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139–40 (1990).

Moreover, the Fourth Circuit has emphasized that "Congress did not intend to preempt 'traditional state-based laws of general applicability [that do not] implicate the

relations among the traditional ERISA plan entities,' including the principals, the employer, the plan, the plan fiduciaries and the beneficiaries." *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1469 (4th Cir. 1996) (quoting *Custer v. Sweeney*, 89 F.3d 1156, 1167 (4th Cir. 1996) (internal quotation marks and alterations omitted)).

Here, the existence of ERISA-covered plans is not essential to plaintiffs' claims. Plaintiffs' claims do not implicate the relations among traditional ERISA plan entities and are premised on pharmacy benefit managers' alleged improper conduct outside the plans in devising their formulary offerings, including, but not limited to: their alleged negotiations and interactions with drug manufacturers and pharmacies; their alleged disregard of information and data in their possession suggesting the need for utilization management due to their financial agreements with manufacturers and desire for profits; their alleged collusion with manufacturers to disseminate false and misleading opioid marketing messages; their alleged operation of mail-order pharmacies; and their alleged administration of Purdue's IPAP. *See* [Doc. 128 at ¶¶ 428–431, 434–457, 483–521, 526–604, 659–714, 683–857]. Plaintiffs' claims also do not seek to force any plan to adopt a particular scheme of substantive coverage.

In *Rutledge v. Pharmaceutical Care Management Association,* the United States Supreme Court came to a similar conclusion, deciding that an Arkansas law regulating the price at which PBMs reimburse pharmacies for the cost of prescription drugs covered by health plans "does not act immediately and exclusively upon ERISA plans because it applies to PBMs whether or not they manage an ERISA plan." 592 U.S. at 88.  The Court noted that the law regulates PBMs "whether or not the plans they service fall within

ERISA's coverage" and specifically gave the counter-example that "PBMs contract with a variety of healthcare plans and programs that are not covered by ERISA, including Medicaid, Medicare, military, and market place plans." *Id.* at 89, n.1.

Similarly, in *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, the Court held that a New York law requiring hospitals to collect surcharges from patients covered by a commercial insurer, but not those covered by Blue Cross/Blue Shield did not impermissibly make "reference to" ERISA plans. 514 U.S. 645 (1995). The Court reasoned that "[t]he surcharges are imposed upon patients and HMO's, regardless of whether the commercial coverage or membership, respectively, is ultimately secured by an ERISA plan, private purchase, or otherwise, with the consequence that the surcharge statutes cannot be said to make 'reference to' ERISA plans in any manner." *Id.* at 656. Here, as in both *Rutledge* and *Travelers*, the plaintiffs' claims cannot be said to make "reference to" ERISA plans as they address formularies regardless as to whether they are adopted by an ERISA plan or a non-ERISA plan.

Under the second "connection with" prong, a state law has an impermissible connection with ERISA plans if "acute, albeit indirect, economic effects" of the state law "force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers." *Gobeille*, 577 U.S. at 320. Put differently, a state law has an impermissible connection with ERISA if it would "require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits, or by binding plan administrators to specific rules for determining beneficiary status." *Rutledge*, 592 U.S. at 86–87 (2020) (internal citations omitted); *see also Pharm. Car Mgmt. Ass'n v.*

*Mulready*, 78 F.4th 1183, 1198 (10th Cir. 2023) (internal quotation and citation omitted) (concluding state laws governing PBMs preempted where "they at least eliminate the choice of one method of structuring benefits"). However, ERISA does not preempt state law "if a law merely affects costs" or "alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage." *Id.* at 87–88.

Plaintiffs' claims do not have an impermissible "connection with" ERISA plans as they do not dictate any particular scheme of substantive coverage. Plaintiffs' success on their claims would not dictate any particular scheme of coverage. Although plaintiffs seek injunctive relief, an injunction would not require defendants to cover alternative, non-medication treatments, cover less addictive treatments, or otherwise structure benefit plans in any particular way.

For these reasons, this Court finds that ERISA does not preempt plaintiffs' claims.

### ii.    Medicare Part D

Defendants also argue that the Medicare Act, 42 U.S.C. § 1395 *et seq.*, preempts plaintiffs' state-law claims with respect to plans covered by Medicare Part D because Medicare Part D contains a broad express preemption clause. [Doc. 109 at 36–37]. Defendants assert that because plaintiffs seek to impose liability based on how prescription drugs are positioned on formularies and UM programs, including the formularies and UM programs used in Part D plans, their claims conflict with the detailed standards set out in the Medicare Act. [Id. at 36].

In Response, plaintiffs assert that the Medicare Act does not preempt plaintiffs' state law claims because their claims do not implicate any established "standards" in the area

regulated by state law.  [Doc. 131 at 43].  Plaintiffs argue their claims "focus on the activities of Defendants in accepting kickbacks to create their formulary offerings and assisting the manufacturers of opioids with their deceptive marketing actions."  [Id.].  Plaintiffs further argue that if "Congress had wanted to protect such misconduct, it undoubtedly would have said so."  [Id.].

In Reply, defendants state plaintiffs "have no answer for the cases holding that Part D preempts formulary-based claims, . . . or creates field preemption that covers the regulation of PBM network terms. . . ." [Doc. 135 at 26].

Medicare Part D incorporates the express preemption clause in Medicare Part C.  42 U.S.C. § 1395w-112(g) (incorporating by reference 42 U.S.C. § 1395w-26(b)(3)).  The clause provides that "[t]he standards established under [Part D] shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Part D] plans which are offered by [Plan D plan sponsors] under this part."  42 U.S.C. § 1395w-26(b)(3); *see* 42 C.F.R. § 423.440(a) (2005).  "The federal scheme preempts a state law when (1) Congress or the Centers for Medicare and Medicaid Services (CMS) has established 'standards' in the area regulated by the state law; and (2) the state law acts 'with respect to' those standards."  ***Pharm. Care Mgmt. Ass'n v. Rutledge***, 891 F.3d 1109, 1113 (8th Cir. 2018), *rev'd on other grounds*, 592 U.S. 80 (2020) (quoting 42 U.S.C. § 1395w-26(b)(3)).

A "standard" within the meaning of this preemption provision means a statutory provision or a regulation promulgated under Medicare and published in the Code of Federal Regulations.  ***Uhm v. Humana, Inc.***, 620 F.3d 1134, 1148 n. 20 (9th Cir. 2010).

21

In support of their argument, defendants cite three cases: ***Pharm. Care Mgmt. Ass'n v. Mulready***, 78 F.4th 1183 (10th Cir. 2023); ***Uhm v. Humana, Inc.***, 620 F.3d 1134 (9th Cir. 2008); and ***Alaska v. Express Scripts, Inc.***, 2024 WL 2321210 (D. Ala. May 22, 2024).

In ***Mulready***, pharmacy benefit managers challenged a state law - the Oklahoma Patients Right of Pharmacy Choice Act ("the Oklahoma act") and related regulations. Clearly, the Oklahoma act was a "state law or regulation."  In fact, in ***Mulready***, the Tenth Circuit noted that:

> Even though the clause contains broad language and only two narrow
> exceptions, we presume that Congress did not intend for Part D to preempt
> state laws of general applicability, such as "environmental laws, laws
> governing private contracting relationships, tort law, labor law, civil rights
> laws, and similar areas of law." *Medicare Program; Medicare Prescription
> Drug Benefit*, 70 Fed. Reg. 4194-01, 4319 (Jan. 28, 2005); *cf.* ***Aetna Life
> Ins. Co. v. Borges***, 869 F.2d 142, 146 (2d Cir. 1989) ("Those [laws] that
> have not been preempted [by ERISA] are laws of general application—often
> traditional exercises of state power or regulatory authority—whose effect on
> ERISA plans is incidental."); ***Cal. Trucking Ass'n v. Bonta***, 996 F.3d 644,
> 657 (9th Cir. 2021) (defining a "generally applicable law" as "one that affects
> individuals solely in their capacity as members of the general public and
> applies to hundreds of different industries" (citations omitted)).

78 F.4th at 1206.

In *Uhm*, the Ninth Circuit dealt with the scope of the preemption provision's expansion beyond state laws and regulations and found that the claims were preempted. With respect to fraud claims, the Court found those claims to be preempted. In doing so, the Court went to great lengths to distinguish *Sprietsma v. Mercury Marine*, 537 U.S. 51 (2022), which held that Section 10 of the Federal Boat Safety Act's express pre-emption clause—which applies to "a [state or local] law or regulation"—is most naturally read as not encompassing common-law claims for two reasons. First, the article "a" implies a discreteness that is not present in common law. Second, because "a word is known by the company it keeps," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, the terms "law" and "regulation" used together indicate that Congress only pre-empted positive enactments.

The Ninth Circuit also relied on CMS's position on preemption. Such reliance is not required in light of *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), in which the Supreme Court, Chief Justice Roberts, held that courts need not, and under the Administrative Procedure Act ("APA") may not, defer to an agency's interpretation of the law simply because a statute is ambiguous, overruling *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See also* *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 187–88 (4th Cir. 2024) ("The APA, in short, incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions.").

Furthermore, the *Uhm* Court noted that CMS has had various interpretations, including for a period taking the position that "tort claims or contract claims under State law are not preempted." 620 F.3d at 1154. In fact, the *Uhm* Court noted that "In its amicus

brief to this court, CMS took the position that, under *Sprietsma*, the Act's express preemption provision does not contemplate common law claims (although such claims can, argued CMS, be impliedly preempted)." 620 F.3d at 1156, n. 34.

Finally, the *Uhm* Court stated that "We emphasize that this holding does not mean that all common law fraud and fraud in the inducement claims would be preempted under the Act. The preemption inquiry turns on the specific allegations forming the basis of those claims, not their labels." 620 F.3d at 1157 n. 35.

Judge Kindred's decision in *Alaska* finds that common law claims with respect to formularies are preempted because those formularies are approved by CMS. Yet in the instant case, plaintiffs' claims are not directed toward the makeup of formularies.

The language of the Medicare Part D statute is clear. Under *Sprietsma*, there is no common law preemption. Even if there were preemption of some common law claims, the claims of the plaintiff are not of the type to be preempted.

In response, the plaintiffs cite to *Pharmaceutical Care Management Assoc. v. Tufte*, 326 F.Supp.3d 873 (D. N.D. 2018), in which Chief Judge Hovland found that the North Dakota statute prohibiting PBMs from engaging in self-dealing was not preempted by Medicare Part D. The claims advanced by plaintiffs in this case of accepting kickbacks and assisting the opiod manufacturers with deceptive marketing schemes are far closer to the claims in *Tufte* than the claims in *Alaska*.

Based upon the foregoing, this Court finds that:

1.      There is no field preemption;

24

2.    The preemption clause deals with statutes and regulations only and does not affect common law claims per *Sprietsma*; and

3.    Even if some common law causes of action were preempted, the specific common law claims asserted by plaintiffs are not preempted.

### D.    Public-Nuisance Claim

Defendants argue, in the alternative, this Court should stay the above-styled case. Defendants argue a stay is warranted pending the Supreme Court of Appeals of West Virginia's answer to a pending certified question in *City of Huntington, West Virginia v. AmerisourceBergen Drug Corp.*, No. 22-1819 [Doc. 137 at 4] (4th Cir. Mar. 18, 2024):

> Under West Virginia's common law, can conditions caused by the distribution of a controlled substance constitute a public nuisance and, if so, what are the elements of such a public nuisance claim?

*Id*. at 4.

Federal courts have inherent authority to stay a case pending the outcome of related proceedings in another court. *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936). "The party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983). Relevant factors include "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." *Tolley v. Monsanto Co.*, 591 F.Supp.2d 837, 844 (S.D. W. Va. 2008) (Goodwin, C.J.) (citation omitted).

25

Judicial economy is not served by granting a stay here because the certified question is relevant only to the existence of a public nuisance claim arising out of the sale of products.  Plaintiffs' other claims would remain regardless of how the Supreme Court of Appeals of West Virginia rules on the existence of a public nuisance claim in that case.

The certified question is set for argument on January 28, 2025, at 1:00 p.m. *City of Huntington and Cabell County Commission v. AmerisourceBergem Drug Corp., et al.*, No. 24-166; *see also* West Virginia Judiciary, Rule 20 Argument https://www.courtswv.gov/node/33051 (last visited Nov. 26, 2024).  Thus, this Court will **DENY** defendants' request to stay the above-styled case and hereby **DEFERS RULING** on plaintiffs' public nuisance claim until a decision is released from the West Virginia Supreme Court of Appeals.

### E.    Negligence and Gross Negligence

In the Third Claim for Relief, plaintiffs allege a claim for negligence.[6]  *See* [Doc. 128 at ¶¶ 958–983].  Defendants argue plaintiffs have failed to allege any element of a negligence claim, let alone that defendants engaged in conduct that "would shock fairminded men" or showed "an utter disregard of prudence amounting to a complete neglect of [ ] safety." [Doc. 109 at 31 (citing *Hopkins v. Grubb*, 160 W.Va. 71, 73, 230 S.E.2d 470, 472 (1977))].

---

[6] Defendants move to dismiss plaintiffs' claims for negligence *and* gross negligence. However, as noted by plaintiffs, plaintiffs do not allege a standalone claim for gross negligence.

In Response, plaintiffs argue they have adequately pled that defendants created a foreseeable risk of harm and policy considerations weigh in favor of imposing a duty. [Doc. 131 at 35].

In Reply, defendants state plaintiffs argue "in a purely conclusory fashion" that defendants owed them a duty of care because defendants "created a foreseeable risk of harm and policy considerations weigh in favor of imposing a duty." [Doc. 135 at 23]. Defendants contend that plaintiffs' duty argument is unsupported by West Virginia law and extends far beyond the scope of traditional negligence principles. [Id.].  Defendants also note that plaintiffs "barely attempt to distinguish *City of Charleston*[*, West Virginia v. Joint Commission*, 473 F.Supp.3d 596 (S.D. W.Va. July 20, 2020) (Copenhaver, J.)], explaining that West Virginia law does not 'extend a duty to the full constellation of individuals and communities who have suffered in the wake of the opioid crisis.'" [Id. (quoting *City of Huntington*, 473 F.Supp.3d at 625)].  Lastly, defendants argue plaintiffs' vague reference to policy considerations "does not override their failure to allege facts that shows [sic] Defendants' actions foreseeably led to the alleged harm." [Id. at 24 (citing *Wal-Mart Stores East, L.P. v. Ankrom*, 244 W.Va. 437, 448, 854 S.E.2d 257, 268 (2020) (quoting *Sewell v. Gregory*, 179 W.Va. 585, 588 371 S.E.2d 82, 85 (1988)))].

This Court will address negligence and gross negligence in turn.

### i.    Negligence

In West Virginia, the plaintiff must establish three elements in a negligence suit: (1) a duty that the defendant owes to the plaintiff, (2) a negligent breach of that duty, and (3) injuries received as a proximate result from that breach. *Webb v. Brown & Williamson*

***Tobacco Co.***, 121 W.Va. 115, 2 S.E.2d 898, 899 (1939).  The plaintiff must prove these elements by a preponderance of the evidence. *Id.* at 899.  "These elements of duty, breach and injury are essential to actionable negligence and in the absence of any of them the action must fall."  ***Atkinson v. Harman***, 151 W.Va. 1025, 1031, 158 S.E.2d 169, 173 (1967).  "The bare fact of an injury standing alone, without supporting evidence, is not sufficient to justify an inference of negligence."  ***Mrotek v. Coal River Canoe Livery, Ltd.***, 214 W.Va. 490, 492, 590 S.E.2d 683, 685 (2003) (quoting ***Walton v. Given***, 158 W.Va. 897, 902, 215 S.E.2d 647, 651 (1975)).

Defendants only challenge the duty element of plaintiffs' negligence claim and argue the PBM Defendants[7] do not owe plaintiffs any legal duty of care.  "In order to establish a prima facie case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff."  Syl. Pt. 1, ***Parsley v. Gen. Motors Acceptance Corp.***, 167 W.Va. 866, 280 S.E.2d 703, 706 (1981).  "Questions of negligence, due care, [and] proximate cause . . . present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them."  Syl. Pt. 5, ***Hatten v. Mason Realty Co.***, 148 W.Va. 380, 135 S.E.2d 236 (1964).  However, the "determination of whether plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law."  ***Aikens v. Debow***, 208 W.Va. 486, 541 S.E.2d 576, 578 (2000).

---

[7] The PBM Defendants consist of Express Scripts, Inc.; Express Scripts Administrators, LLC; Medco Health Solutions, Inc.; and OptumRx, Inc. [Doc. 109 at 13].

"In determining whether a duty exists, courts must consider foreseeability of risk and, "[b]eyond the question of foreseeability, ... policy considerations underlying the core issue of the scope of the legal system's protection ... includ[ing] the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant." *Speedway LLC v. Jarrett*, 248 W.Va. 448, 454, 889 S.E.2d 21, 27 (2023) (quoting *Robertson v. LeMaster*, 171 W.Va. 607, 612, 301 S.E.2d 563, 568 (1983) (internal citations omitted)).

When foreseeability is disputed, a court's "overall purpose in its consideration of foreseeability in conjunction with the duty owed is to discern in general terms whether the type of conduct at issue is sufficiently likely to result in the kind of harm experienced based on the evidence presented." *Strahin v. Cleavenger*, 216 W.Va. 175, 185, 603 S.E.2d 197, 202 (2004). "If the court determines that disputed facts related to foreseeability, viewed in the light most favorable to the plaintiff, are sufficient to support foreseeability, resolution of the disputed facts is a jury question." *Id*.

Essentially, this Court's role is to assess whether the evidence is sufficient for a jury to determine whether it was foreseeable that the defendants' actions, given the facts of this case—whether disputed or not—could have created an unreasonable risk of harm to the plaintiffs under the circumstances.

Here, taking plaintiffs' allegations as true, this Court finds that plaintiffs have adequately pled that not just the PBM Defendants, but all defendants, created a foreseeable risk of harm weighing in favor of imposing a duty. As alleged in the Second Amended Complaint:

- Defendants collected and tracked real time opioid prescription data and prescription level information, making them uniquely aware of the opioid epidemic. [Doc. 128 at ¶¶ 483–496, 511, 514].

- Defendants had knowledge that plaintiffs' communities were being flooded with a volume of prescription opioids far in excess of what was medically or reasonably necessary, had specific information of diversion and abuse as it occurred, and were on notice of dispensing red flags indicative of abuse and diversion within plaintiffs' communities. [Id.].

- Defendants knew at the outset of the opioid epidemic that widespread abuse and diversion were occurring. Defendants even documented these concerns internally and to the opioid manufacturers. [Id. at ¶¶ 504–508, 512–518].

- Defendants' awareness was further heightened when they received concerns from their customers about prescription opioid abuse and diversion. [Id. at ¶¶ 411–420].

Moreover, policy considerations also support the imposition of a duty. Opioid drugs are highly addictive. The likelihood of injury from negligent conduct involving opioids is high. The harm to people and the communities is catastrophic. As declared in the Federal Opioid MDL:

When there is a flood of highly addictive drugs into a community it is foreseeable—to the point of being a foregone conclusion—that there will be a secondary, "black" market created for those drugs. It is also foreseeable that local governments will be responsible for combatting the creation of that market and mitigating its effects.

*In re Nat'l Pharm. Opiate Litig.*, 2018 WL 6628898, at *19 (N.D. Ohio Dec. 19, 2018). Plaintiffs have stated a plausible claim that it was reasonably foreseeable that they would be forced to bear the public costs of increased harm from the alleged over-prescription and oversupply of opioids in their communities if defendants failed to implement and/or follow adequate controls in their marketing, sales, distribution, and dispensing of opioids.

Defendants rely on *City of Charleston*, 473 F.Supp.3d 596 in arguing that West Virginia courts have rejected attempts to extend negligence claims to participants in the healthcare industry like the PBM defendants. [Doc. 109 at 31–32]. In *City of Charleston*, plaintiffs brought negligence claims against defendant, a not-for-profit organization that accredited and certified approximately 21,000 public and private health care organizations and programs in the United States. *City of Charleston*, 473 F.Supp.3d at 603. Plaintiffs alleged in the complaint that defendant "collaborated with Purdue Pharma L.P. and its affiliates . . . and other opioid manufacturers to issue Pain Management Standards ('PM Standards') . . ., as set forth in the accompanying 'Comprehensive Accreditation Manual for Hospitals: The Official Handbook,' and 'other related documents' as part of [defendant's] certification program." *Id*. at 606. Plaintiffs asserted that "the PM Standards and related materials 'grossly misrepresented the addictive qualities of opioids and fostered dangerous pain control practices, the result of which was often inappropriate provision of opioids with disastrous adverse consequences.'" *Id*. The complaint alleged that "[d]efendants owed a duty of care to the Municipalities, including but not limited to taking steps to promulgate reasonable health care standards that would not lead directly to the misuse, abuse, and over-prescription of opioids." *Id.* at 620.

Because defendant "had no control or responsibility over the manufacturing or distributing of opioids," Judge Copenhaver "conclude[d] that plaintiffs have not alleged facts to plausibly show that defendants could reasonably foresee the harms described in the complaint." *Id.* at 621. The court reasoned that "[s]everal intermediaries stand in between plaintiffs and defendants, including the [health care organizations] responsible for issuing their own pain management protocols, the medical practitioners responsible for issuing opioid treatments, as well the pharmaceutical manufacturers, distributors, and retailers who bring the opioids to market in the first place." *Id.* at 623.

Unlike the defendants in *City of Charleston*, here, plaintiffs have sufficiently alleged that the PBM Defendants exerted significant and direct control over the instrumentality of harm, the supply and oversupply of prescription opioids in plaintiffs' communities. *See* [Doc. 128 at ¶¶ 3, 5–19, 35–44, 46, 48–53, 77–78, 958–983].

Moreover, defendants' argument that no duty can be imposed because their actions are "too far removed" from plaintiffs' harm is unavailing. [Doc. 109 at 32]. Under West Virginia law, the acts of third parties, including criminal activity or intentional misconduct, do not constitute an intervening cause or eliminate a duty of care if the conduct was foreseeable. *Wal-Mart Stores East, L.P. v. Ankrom*, 244 W.Va. 437, 448, 854 S.E.2d 257, 268 (2020); *Boyce v. Monongahela Power Co.*, 249 W.Va. 131, 141, 894 S.E.2d 913, 923 (2023). Here, the actions of third parties (i.e., manufacturers, distributors, and/or dispensers) were entirely foreseeable.

In the Second Amended Complaint, plaintiffs have alleged facts pertaining to each requisite element in a negligence claim as to all defendants. Specifically, plaintiffs have

identified that defendants owed duties to plaintiffs, including "a duty to employ reasonable standards of care in the sale, delivery, dispensing, promotion, and gatekeeping control of the supply of highly addictive, dangerous opioids.  This duty includes a duty to not create a foreseeable risk of harm or injury."  [Doc. 128 at ¶ 959].  Plaintiffs go on to allege that defendants breached their duty "by failing to exercise reasonable care or skill with respect to their opioid-related conduct.  Collectively, and individually, Defendants made highly addictive prescription opioids available to the marketplace with the knowledge that they were likely being used for non-medical purposes and/or posed an inherent danger especially to patients who were using opioids for chronic pain not associated with active cancer, end-of-life or palliative care.  Defendants knew or reasonably should have known that their breach would foreseeably cause harm to Plaintiffs and Plaintiffs' Communities." [Id. at ¶ 966].

Assuming these allegations to be true and viewing these facts in the light most favorable to plaintiffs, this Court finds that plaintiffs have properly pled their claim for negligence.  Under the circumstances alleged in plaintiffs' Second Amended Complaint, it was foreseeable that defendants' actions and inactions would result in harm to plaintiffs and, therefore, defendants owed a duty of care to plaintiffs as alleged in the Second Amended Complaint.  This Court finds the evidence is sufficient for a jury to determine whether it was foreseeable that the defendants' actions, given the facts of this case—whether disputed or not—could have created an unreasonable risk of harm to the plaintiffs under the circumstances. Thus, this Court **DENIES** defendants' Motion regarding plaintiffs' Third Claim for Relief.

33

This ruling is in accord with the majority of other jurisdictions addressing the issue in opioid litigation, including West Virginia courts and the Federal Opioid MDL. *Id.*; *see also* [Docs. 131-4 & 131-5]; *In re Opioid Litig.*, 2018 WL 3115102, at *26 (N.Y. Sup. Ct. June 18, 2018); *City of Boston v. Purdue Pharma, LP*, 2020 WL 416406, at *9 (Super. Ct. Mass. 2020) (finding negligence claims survived motions to dismiss because "courts do not hesitate to impose a duty of care upon entities who participate in creating known or knowable risks and who are well situated to mitigate them"); *State v. Purdue Pharma L.P.*, 2019 WL 3991963, at *16 (R.I. Super. Aug. 16, 2019) (holding plaintiffs properly alleged that defendants owed duties not to cause foreseeable harm and breached those duties through their misconduct in marketing and selling opioids); *cf. City of Charleston*, 473 F.Supp.3d 596, 622 (dismissing negligence claim because "plaintiffs have not alleged facts to plausibly show that defendants could reasonably foresee the harms described in the complaint").

### ii.    Gross Negligence

Defendants also argue that plaintiffs "fall far short of alleging a valid claim for gross negligence." [Doc. 109 at 32].  In Response, plaintiffs state they "have not asserted a standalone claim for gross negligence." [Doc. 131 at 34].

To prevail on a claim of gross negligence, plaintiffs generally must show the same basic elements of ordinary negligence, differing only in the degree of actionable inattention on the defendant's part. *City of Charleston, W. Virginia v. Jt. Commn.*, 473 F.Supp.3d 596, 625 (S.D. W Va. 2020) (Copenhaver, J.). *But see Wood v. Shrewsbury*, 117 W.Va. 569, 186 S.E. 294, 296–97 (1936) (Where the plaintiff seeks to establish gross negligence,

he must present "affirmative proof tending to magnify the negligence."). Further, "[w]hile the West Virginia Supreme Court of Appeals has never provided its own definition of gross negligence, it has interpreted Virginia law to define gross negligence as the degree of negligence which shows an utter disregard of prudence amounting to complete neglect of the safety of another." *City of Charleston, W. Virginia v. Jt. Commn.*, 473 F.Supp.3d at 625 n.15 (cleaned up) (quoting *Rutecki v. CSX Hotels, Inc.*, 290 Fed.App'x. 537, 542–43 (4th Cir. 2008) and *Dodrill v. Young*, 143 W.Va. 429, 102 S.E.2d 724, 730 (1958)).

This Court notes that the term "gross negligence" appears in the Second Amended Complaint twice. *See* [Doc. 128 at ¶¶ 917, 983]. The first time is under plaintiffs' First Claim for Relief, Common Law Public Nuisance, and the second time is under plaintiffs' Third Claim for Relief, Negligence. *See* [id.]. The Second Amended Complaint does not have a standalone claim for gross negligence. *See generally* [id.]. Plaintiffs also provide no argument in their Response as to why their purported gross negligence claim should not be dismissed, nor do they offer any specific arguments to support a separate claim for gross negligence. Therefore, insofar as the Second Amended Complaint asserts a claim for gross negligence, the same is **DISMISSED**.

### F.    Civil Conspiracy

In the Fourth Claim for Relief, plaintiffs allege a civil conspiracy claim. *See* [Doc. 128 at ¶¶ 984–996]. Defendants argue plaintiffs' civil conspiracy claim should be dismissed because the "conspiracy claim falls with their underlying tort claims." [Doc. 109 at 33]. In Response, plaintiffs assert that because their underlying tort claims state plausible claims, their civil conspiracy claim also survive. [Doc. 131 at 38–39].

A "civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff." *Kessel v. Leavitt*, 204 W.Va. 95, 128, 511 S.E.2d 720, 753 (1998).

Plaintiffs' Second Amended Complaint sets forth detailed allegations regarding conspiracies among defendants which created and fueled the opioid epidemic in West Virginia, resulting in harm to plaintiffs. *See* [Doc. 128 at ¶¶ 984–996]. Because a "civil conspiracy must be based on some underlying tort or wrong" and given that this Court has not dismissed plaintiffs' negligence claims, a valid civil conspiracy claim exists. *O'Dell v. Stegall*, 226 W.Va. 590, 625, 703 S.E.2d 561, 596 (2010). Thus, this Court **DENIES** defendants' Motion regarding plaintiffs' Fourth Claim for Relief.

### G. Unjust Enrichment

In the Fifth Claim for Relief, plaintiffs allege an unjust enrichment claim. *See* [Doc. 128 at ¶¶ 997–1007]. Plaintiffs allege that they conferred a benefit upon defendants "by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper practices," and that retention of that benefit would be unjust. [Id. at ¶¶ 1001–1004].

Defendants assert that plaintiffs (1) have not alleged a relationship—business or otherwise—between themselves and defendants; (2) have not identified a benefit that they conferred on defendants; (3) have not identified a benefit that defendants knew of or should have expected to repay; and (4) have not identified a benefit that defendants have

retained. [Doc. 109 at 33]. Defendants argue that under West Virginia law, plaintiffs' claims are "patently insufficient to state a [sic] unjust-enrichment claim." [Id. at 34 (citing ***Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.***, 681 F.Supp.2d 694, 728, 731–32 (S.D. W.Va. 2009) (Goodwin, C.J.) and ***Hill v. Stowers***, 224 W.Va. 51, 60, 680 S.E.2d 66, 75 (2009))]. Defendants argue the Second Amended Complaint "lacks any allegation that 'benefits have been received and retained [by the Defendants from Plaintiffs] under such circumstances that it would be inequitable and unconscionable to permit [Defendants] to avoid payment therefor.'" [Id. (quoting ***Realmark Devs. Inc. v. Ranson***, 208 W.Va. 717, 721–22, 542 S.E.2d 880, 884–85 (2000))]. Moreover, defendants assert that there is no factual allegation plausibly suggesting that increased municipal costs saved defendants from any expense or loss. [Id. at 35].

In Response, plaintiffs assert they have "expended substantial amounts of money in an effort to remedy or mitigate the societal harms" thus conferring a benefit upon defendants "by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper practices." [Doc. 131 at 39 (quoting [Doc. 128 at ¶¶ 1000, 1001])]. Plaintiffs further assert that the retention is unjust because defendants "were aware of these obvious benefits" which "helped sustain Defendants' businesses." [Id. (quoting [Doc. 128 at ¶ 1000, 1002])]. Moreover, plaintiffs assert the cases relied on by defendants are inapposite. [Id.].[8]

---

[8] Plaintiffs, in a footnote, state ***Exec. Risk Indem. Inc.*** is inapposite because the court dismissed an unjust enrichment cross-claim when the party asserting it had not alleged that it had paid out any money or been directly harmed, but a separate party's unjust enrichment claim who had been paid the money survived the motion to dismiss. 681 F.Supp.2d 694. Plaintiffs also state ***Hill*** is inapposite because the court dismissed an unjust enrichment claim because the plaintiff did not pay out any money. 224 W.Va. 51,

37

In Reply, defendants argue plaintiffs' "attempt to defend their unjust enrichment claim . . . ignores the crux" of defendants' argument that plaintiffs' have not and cannot allege the quasi-contractual relationship required under West Virginia law to support such a claim. [Doc. 135 at 24]. Defendants also state that plaintiffs offer no response to their failure to plausibly allege that their purported excessive "municipal costs" saved defendants from any expense or loss. [Id.].

Unjust enrichment, or quantum meruit, is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Fleer Corp. v. Topps Chewing Gum, Inc.,* 539 A.2d 1060, 1062 (Del. 1988); *Thompson v. Merchant's & Mechanics' Bank of Wheeling*, 3 W.Va. 651, 1869 WL 1963 (1869) (recognizing unjust enrichment cause of action in West Virginia).

The elements of an unjust enrichment claim in West Virginia are (1) a benefit conferred upon the defendant; (2) an appreciation or knowledge by the defendant of such a benefit; and (3) the defendant's acceptance of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. *Employer Teamsters-Local Nos. 175/505 Health & Welfare Trust Fund v. Bristol Myers Squibb Co.,* 969 F.Supp.2d 463, 471 (S.D. W.Va. 2013) (Chambers, C.J.) (internal citations omitted). "'A person may be unjustly enriched not only where he receives money or property, but also where he otherwise receives a benefit. He receives a benefit . . . where he is saved expense or loss.'" *Prudential Ins. Co. of America v. Couch*, 180

_____

680 S.E.2d 66.

W.Va. 210, 215, 376 S.E.2d 104, 109 (1988) (quoting *Blue Cross of Cent. New York,
Inc. v. Wheeler*, 93 A.D.2d 995, 996, 461 N.Y.S.2d 624, 626 (1983)).

A direct transactional relationship is not a prerequisite for unjust enrichment. *See
Absure, Inc. v. Huffman*, 213 W.Va. 651, 654–55, 584 S.E.2d 507, 510–11 (2003)
(improper indirect payment could be basis for unjust enrichment and "a third party
connected with a transaction may seek restitution where there is unjust enrichment which
resulted from the third party satisfying an obligation of the unjustly enriched party"); *Dunlap
v. Hinkle*, 173 W.Va. 423, 426, 317 S.E.2d 508, 512 n.2 (1984) ("unjust enrichment does
not necessitate a finding of privity of contract between the parties") (citations omitted).
Thus, "if benefits have been received and retained under such circumstance that it would
be inequitable and unconscionable to permit the party receiving them to avoid payment
therefor, the law requires the party receiving the benefits to pay their reasonable value."
*Realmark Devs. v. Ranson*, 208 W.Va. 717, 721–22, 542 S.E.2d 880, 884–85 (2000).

Based on the alleged facts in this case, plaintiffs state a facially plausible unjust
enrichment claim on the theory that they conferred a benefit upon all defendants by
alleging that plaintiffs paid for the cost of harm caused by defendants' conduct, *i.e.*,
defendant's externalities. *See, e.g.*, *White v. Smith & Wesson*, 97 F.Supp.2d 816, 829
(N.D. Ohio 2000) (finding that a municipal plaintiff adequately pled an unjust enrichment
claim where it was alleged that plaintiff "conferred a benefit upon Defendants, *i.e.*, that the
City paid for what may be called the Defendants' externalities—the costs of the harm
caused by Defendants' [conduct]."); *City of Everett v. Purdue Pharma L.P.*, 2017 WL
4236062, at *9 (W.D. Wash. Sept. 25, 2017) (finding that plaintiffs' unjust enrichment claim

based on their payment of the "so called externalities" of a defendant's conduct was not facially implausible); *City of Los Angeles v. Wells Fargo & Co.*, 22 F.Supp.3d 1047, 1061 (C.D. Cal. 2014) (finding a sufficient restitution theory where plaintiff alleged the benefits conferred were "externalities—the costs of harm caused by Defendants' discriminatory lending that the City has had to shoulder"); *City of Los Angeles v. Bank of Am. Corp.*, 2014 WL 2770083, at *12–13 (C.D. Cal. June 12, 2014) (finding a valid claim for unjust enrichment where plaintiff alleged that the defendants' predatory lending resulted in their enrichment at plaintiffs' expense, which paid for defendants' "externalities, or costs of harm caused by its mortgage lending discrimination"); *City of Boston v. Smith & Wesson Corp.*, 2000 WL 1473568, at *18 (Super. Ct. Mass. July 13, 2000) (finding plaintiffs stated a claim for unjust enrichment by alleging that they "conferred a benefit upon Defendants by paying for the costs of the harm caused by Defendants' conduct ("externalities")").

This Court further agrees with plaintiffs that cases relied on by defendants are inapposite. First, in *Exec. Risk Indem. Inc.*, Chief Judge Goodwin found, on the one hand, that a party who alleged it paid premiums for twenty-five (25) years in the amount of $2,568,646,51 annually, stated a valid claim for unjust enrichment. *Exec. Risk Indem. Inc.*, 681 F.Supp.2d at 728. On the other hand, Chief Judge Goodwin dismissed another party's unjust enrichment cross-claim because that party did not allege it paid any money out. *Id.* at 732.

Second, in *Hill*, the Supreme Court of Appeals of West Virginia found that a plaintiff had no basis to pursue a claim for unjust enrichment because the plaintiff did not pay out any money. 224 W.Va. at 60, 680 S.E.2d at 75.

40

In this case, plaintiffs allege they have "expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct." [Doc. 128 at ¶ 1000]. Plaintiffs go on to assert that they have "conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper practices." [Id. at ¶ 1001]. Assuming these allegations to be true and viewing these facts in the light most favorable to plaintiffs, this Court finds that plaintiffs have properly pled their claim for unjust enrichment. Thus, this Court **DENIES** defendants' Motion regarding plaintiffs' Fifth Claim for Relief.

### H.    Miscellaneous Entities

Defendants further argue that plaintiffs fail to state any claim against miscellaneous entities. [Doc. 109 at 37–38]. Defendants assert plaintiffs name several Express Scripts, Evernorth,[9] and Optum[10] entities without stating any specific allegations against those entities. [Id.]. With respect to Express Scripts and Evernorth, defendants argue plaintiffs "merely allege that these entities 'transact[ed] business in West Virginia, including in the Plaintiffs' communities,' and then lump these entities into the general allegations against 'ESI'." [Id. at 37 (internal citations omitted)]. Defendants further argue that plaintiffs do not allege any wrongdoing by these entities and do not allege how these entities were involved

---

[9] For Express Scripts and Evernorth, these entities include: Express Scripts Sales Operations, Inc., Evernorth Health, Inc., Evernorth Care Solutions, Inc., Evernorth Direct Health, LLC, Evernorth Behavioral Health, Inc., and Evernorth Sales Operations, Inc. [Doc. 109 at 37].

[10] For Optum, these entities include: UnitedHealth Group Incorporated, OptumRx Discount Card Services LLC, Optum Perks, LLC, OptumInsight, Inc., Optum Insight Life Sciences, Inc., OptumHealth Care Solutions, LLC, OptumHealth Holdings, LLC, and Optum Health Networks, Inc. [Doc. 109 at 38].

in the "PBM," "data," and "mail order pharmacy" activities. [Id.].  Moreover, defendants contend that the allegation that Evernorth Health is the parent company to the other Express Scripts defendants does not change the calculus: "a parent corporation . . . is not liable for the acts of its subsidiaries." [Id. (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998))].

With respect to Optum, defendants first contend that even if this Court has personal jurisdiction over certain Optum entities, plaintiffs' Second Amended Complaint is deficient because plaintiffs "barely reference" the Optum entities and when plaintiffs do reference these entities, "they do so by lumping them together . . . or else reference only their citizenship and registration to do business. . . ." [Id. at 39].  Defendants argue plaintiffs' "group pleading about these entities and allegations regarding their citizenship are insufficient to state a claim under any of Plaintiffs' substantive theories." [Id.].

In Response, plaintiffs assert that the ESI entities are collectively defined and referred to as "Express Scripts" or "ESI" throughout the Second Amended Complaint, while the Optum entities are similarly defined and referred to as "Optum." [Doc. 131 at 44; Doc. 128 at ¶¶ 207–208; 273–274].  As such, they argue that these entities are properly included in all allegations directed at those defendants. [Doc. 131 at 44].

In Reply, defendants argue that plaintiffs "merely lump[ing] these Defendants into general allegations, rather than make any specific allegation against a particular entity that would support a plausible allegation of tortious or illegal conduct" is not enough. [Doc. 135 at 27].

This Court first notes that there is a pending Motion to Dismiss for Lack of Jurisdiction with respect to the Optum entities.  *See* [Doc. 105].  Because briefing on the

42

Motion to Dismiss for Lack of Jurisdiction is not due until January 17, 2025 [Doc. 132], this Court will address the current arguments under the assumption that it has personal jurisdiction, as of right now, over the Optum entities.

"Nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *Vantone Group Ltd. Liab. Co. v. Yangpu NGT Indus. Co., Ltd.*, 2015 WL 4040882, at *4 (internal citation and quotation omitted).  "There is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct."  *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016); *see also In re Nat'l Prescription Opiate Litig.*, 2019 WL 2468267, at *13 (N.D. Ohio Apr. 1, 2019) (finding cases relied upon by defendants "d[id] not stand for the proposition that where multiple defendants are alleged to have engaged the same pattern of conduct or conspired in a fraudulent scheme, that a plaintiff must reiterate its allegations against each defendant individually. Such a finding would exponentially increase the length of pleadings while adding no substantive value."); *Chevron U.S.A. Inc. v. Apex Oil Co.*, 113 F.Supp.3d 807, 815 n.1 (D. Md. 2015) (Motz, J.) ("Chevron's claims against Apex do not fail merely because Chevron grouped the defendants in order to bring identical claims against each of them.") *United States ex rel. Strauser v. Stephen L. LaFrance Holdings, Inc.*, 2019 WL 1086363, at *15–16 (N.D. Okla. Mar. 7, 2019) (rejecting defendants' "clustering" of defendants argument because plaintiff alleged "a uniform, chainwide scheme facilitated through a shared centralized pharmacy transaction system"); *Sprint Solutions, Inc. v. Fils-Amie*, 44 F.Supp.3d 1224,

1227 (S.D. Fla. 2014) ("a plaintiff may plead claims against multiple defendants by referring to them collectively"); *Frazier v. U.S. Bank Nat. Ass'n*, 2013 WL 1337263, at *3 (N.D. Ill. Mar. 29, 2013) ("Although Plaintiff refers to [defendants] collectively, Plaintiff has provided sufficient factual detail about the nature of his allegations and about each defendant to provide fair notice of his claims.").

In this case, plaintiffs' claims against Express Scripts, Evernorth and Optum entities do not fail merely because plaintiffs grouped defendants in order to bring identical claims against each of them.

With respect to defendants' argument regarding parent companies, this Court finds that at this stage of the proceedings, plaintiffs have alleged that both parent companies, Evernorth Health Inc. and UnitedHealth Group, "through [their] executives and employees, control[led] the enterprise-wide policies that inform [their] lines of business in order to maximize profits across the corporate family." [Doc. 128 at ¶¶ 173, 224]. Thus, this Court **DENIES** defendants' Motion regarding their argument that plaintiffs failed to state a claim against miscellaneous entities.

## I.    City of Huntington's Claims Against Express Scripts[11]

Defendants contend that Federal Rule of Civil Procedure 41(a)(1)(B) bars Huntington's claims against Express Scripts because plaintiff City of Huntington has twice

---

[11] As a preliminary matter, this argument only applies to plaintiff City of Huntington and does not address or apply to plaintiff City of Huntington's claims against the Optum Defendants or any of the eleven (11) other Express Scripts-entity Defendants besides Express Scripts, Inc. and Evernorth Health, Inc. (f/k/a Express Scripts Holding Company). *See* [Doc. 109 at 38 ("Plaintiff City of Huntington has twice voluntarily dismissed, under Rule 41, its opioid-related claims against  Express Scripts, Inc. and Evernorth Health, Inc. (f/k/a Express Scripts Holding Company). . . .")].

voluntarily dismissed its opioid-related claims against Express Scripts, Inc. ("ESI") and Evernorth Health, Inc. (f/k/a Express Scripts Holding Company) ("EHI").[12] [Doc. 109 at 38–39]. Defendants assert that in both cases, plaintiff City of Huntington raised claims—including identical tort claims—stemming out of the same conduct alleged here. [Id. at 39 (*comparing* [Doc. 108-2 at ¶¶ 284–89, 1134–48 and [Doc. 108-3 at ¶¶ 40–64] *with* [Doc. 128 at ¶¶ 407–670])]. Defendants argue because plaintiff City of Huntington dismissed all claims against Express Scripts and Evernorth that Rule 41(a)(1)(B) rendered the second dismissal an adjudication on the merits and bars plaintiff City of Huntington's claims here. [Id.].

In Response, plaintiffs assert:

Huntington filed suit against ESI, EHI, and various retail pharmacies on March 14, 2018. The Federal Opioid MDL court's first case management order stayed discovery in that and all non-bellwether cases. On December 31, 2018, that court designated a separate MDL case by Huntington against manufacturer and distributor Defendants as part of a bellwether track (with a case by Cabell County) in which discovery was to commence. Since the Track Two Huntington and Cabell cases were in active litigation, those Plaintiffs on July 19, 2019 filed a Joint Third Amended Complaint naming additional Defendants, including those in Huntington's separate action

---

[12] The first time in *City of Huntington v. Express Scripts Holding Co., et al.*, No. 1:18-op-45984 (N.D. Ohio Aug. 11, 2019) [Doc. 56] (attached to the instant Motion at [Doc. 108-4]) and the second time in *City of Huntington, et al. v. AmerisourceBergen Drug Corp., et al.*, No. 3:17-cv-01362 (S.D. W.Va. July 26, 2024) [Doc. 1543] (attached to the instant Motion at [Doc. 108-5]).

against ESI, EHI, and retail pharmacies.  With the ESI and EHI claims now

part of the active bellwether case, Huntington sought to avoid duplication and

delay by voluntarily dismissing its claims in the separate action against ESI

and EHI (and all other Defendants therein) on August 11, 2019.

[Doc. 131 at 45–46 (internal footnotes omitted)].

In Reply, defendants state plaintiffs "do not contest that City of Huntington has twice

dismissed claims against Express Scripts." [Doc. 135 at 26].  Defendants assert that

plaintiffs argument that Federal Rule of Civil Procedure 41's "adjudication on the merits"

is inapplicable because one (1) of the prior actions was "dismissed before any litigation had

occurred" and "to avoid duplication and delay" fails because Rule 41 does not allow for any

such exceptions.  [Id.].

Federal Rule of Civil Procedure 41(a)(1)(B) (the "two-dismissal rule") states in

pertinent part, as follows:

Unless the notice of dismissal or stipulation states otherwise, the dismissal

is without prejudice. But if the plaintiff previously dismissed any federal – or

state – court action based on or including the same claim, a notice of

dismissal operates as an adjudication on the merits.

"Because a notice of a second dismissal by the plaintiff serves as an 'adjudication on the

merits,' the doctrine of *res judicata* applies." ***Manning v. South Carolina Dept. of

Highway and Public Transp.***, 914 F.2d 44, 47 (4th Cir. 1990) (citing ***Engelhardt v. Bell

& Howell Co.***, 299 F.2d 480, 484 (8th Cir. 1962).

46

"It seems to be universally accepted that the primary purpose of the 'two dismissal' rule is to prevent an unreasonable use of the plaintiff's unilateral right to dismiss an action prior to the filing of the defendant's responsive pleading. ***Engelhardt v. Bell & Howell Company, 299 F.2d 480***, 481–82 (8th Cir. 1962); 5 J. Moore, Federal Practice P 41.04, at 1045, n.16 (2d ed. 1974)." ***Poloron Products, Inc. v. Lybrand Ross Bros. and Montgomery***, 534 F.2d 1012, 1017 (2d Cir. 1976).

"Where the purpose behind the 'two dismissal' exception would not appear to be served by its literal application, and where that application's effect would be to close the courthouse doors to an otherwise proper litigant, a court should be most careful not to construe or apply the exception too broadly." ***Id***. "The basic purpose of the Federal Rules is to administer justice through fair trials, not through summary dismissals as necessary as they may be on occasion." ***Surowitz v. Hilton Hotels Corp.***, 383 U.S. 363, 373 (1966).

Plaintiffs argue that plaintiff City of Huntington's MDL amendment and dismissal, rather than burdening or harassing ESI and EHI, expedited resolution by moving the claims against them from a dormant to an active case track. This Court agrees.

Plaintiff City of Huntington filed suit against ESI, EHI, and other various retail pharmacies on March 14, 2018. [Doc. 108-4]. ESI and EHI removed the case from the Circuit Court of Kanawha County, West Virginia, to the United States District Court for the Northern District of Ohio on April 16, 2018. *See **City of Huntington, West Virginia, et al. v. Express Scripts Holding Company, et al.***, No. 1:18-OP-45984 (N.D. Ohio Apr. 16, 2018) [Doc. 7]. A little over a month after the removal, and before ESI and EHI filed any

responsive pleadings,[13] ESI and EHI filed a Motion to Stay the Proceedings pending Resolution of the Conditional Transfer Order. *Id*. at [Doc. 23]. Two (2) days after ESI and EHI filed their Motion to Stay, the Northern District of Ohio granted the Motion to Stay, staying the case

> pending full resolution of the Conditional Transfer Order 26 . . ., entered by the Judicial Panel on Multidistrict Litigation . . . for In Re: National Prescription Opiate Litigation, MDL No. 2804 on April 25, 2018 (JPML Dkt. No. 1302), including briefing related to Plaintiffs' Motion to Remand and Defendants' responses to the Complaint.

> If the present case is not transferred to MDL 2804, the parties will agree to a briefing schedule and file an unopposed motion regarding scheduling in connection with Plaintiffs' Motion to Remand and Defendants' responses to the Complaint.

*Id*. at [Doc. 24 at 1–2]. On December 31, 2018, the Federal Opioid MDL designated a separate MDL case by the City of Huntington against manufacturer and distributor defendants as part of a bellwether track in which discovery was to commence. [Doc. 131-10]. Because the Track Two City of Huntington and Cabell County cases were in active litigation, those plaintiffs on July 19, 2019, filed a Joint Third Amended Complaint naming additional defendants, including those in the City of Huntington's separate action against ESI, EHI, and retail pharmacies. [Doc. 108-2]. The City of Huntington then

---

[13] ESI and EHI also filed a Motion to Extend Time to Respond to Plaintiffs' Complaint and plaintiffs filed a Motion to Remand. *City of Huntington, West Virginia, et al.*, No. 1:18-OP-45984 (N.D. Ohio) [Docs. 10 & 20].

dismissed its claims in the separate action against ESI and EHI (and all other defendants therein) on August 11, 2019, because the ESI and EHI claims were then part of the active bellwether case. [Doc. 108-4].

If plaintiff City of Huntington had not voluntarily amended and dismissed its claims against ESI and EHI, those claims would still be stayed in the MDL. This Court will not "close the courthouse doors" to plaintiff City of Huntington simply because it chose to dismiss dormant claims against ESI and EHI, given that those claims were part of an active case track.  Furthermore, as previously mentioned, there had been minimal litigation in *City of Huntington, West Virginia, et al.*, No. 1:18-OP-45984 (N.D. Ohio) prior to the voluntary dismissal.  In reality, ESI and EHI has faced only two lawsuits, including the above-styled case.  Thus, this Court **DENIES** defendants' Motion regarding their argument that Rule 41 bars plaintiff City of Huntington's claims against ESI and EHI.

## J.    Forum-Shopping

Defendants contend that the Second Amended Complaint as to plaintiffs City of Huntington and Cabell County should be dismissed because they are engaged in improper forum-shopping.  [Doc. 109 at 39].  Defendants assert that plaintiffs City of Huntington and Cabell County sued Express Scripts and Optum five (5) years ago, where, following a bench trial, Judge Faber "resoundingly rejected Huntington's and Cabell's public-nuisance claim against opioid distributors, including on the grounds that they could not state a viable public-nuisance claim under West Virginia law. [Id. (citing *City of Huntington*, 609 F.Supp.3d 408)].  Defendants argue that plaintiffs "gamesmanship to avoid adverse law from a case they were party to and that was litigated for years in another district should not

be countenanced," and their claims should be dismissed under Rule 12(b)(3) for improper venue.  [Id.].  Moreover, defendants also assert that because plaintiffs cannot state a colorable RICO claim, that claim cannot provide venue. [Id. at 40].

In Response, plaintiffs argue defendants are both factually and legally incorrect. {Doc. 131 at 47].  Factually, plaintiffs contend, "Cabell and Huntington chose to file with the other West Virginia subdivisions to take advantage of the judicial economy that will come from having their claims all pending in the same court.  There is nothing improper about that decision."  [Id.].  Plaintiffs assert legally "any supposed forum shopping does not support dismissal for improper venue."  [Id.].

In Reply, defendants argue plaintiffs City of Huntington and Cabell County cannot justify "their blatant forum shopping" by "halfheartedly argu[ing] they are merely seeking 'to take advantage of the judicial economy that will come from having their claims all pending in the same court.'" [Doc. 135 at 27].  Defendants contend that argument is not credible because their claims were already pending for years in *City of Huntington* before Judge Faber, who had already expended significant judicial time and resources becoming familiar with the facts and law applicable to the case. [Id.].

Rule 12(b)(3) allows a party to move to dismiss a case for improper venue.  When an objection to venue is raised under Rule 12(b)(3), the burden is generally on the plaintiff to show that venue is proper. *Colonna's Shipyard, Inc. v. City of Key West*, 735 F.Supp.2d 414, 416 (E.D. Va.2010) (Davis, J.) (citing *Bartholomew v. Va. Chiropractors Ass'n, Inc.*, 612 F.2d 812, 816 (4th Cir.1979), *overruled on other grounds by Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982)). The plaintiff is obliged, however, to make

only a prima facie showing of proper venue in order to survive a motion to dismiss. *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 366 (4th Cir. 2012). In assessing whether plaintiff has made that showing, courts must construe all factual allegations in favor of the plaintiff. *Id.* Unlike on a Rule 12(b)(6) motion, courts considering a Rule 12(b)(3) motion are permitted to consider evidence outside the pleadings. *Id.*

The question whether venue is "wrong" or "improper" in a federal forum is governed by the general federal venue statute, 28 U .S.C. § 1391, which applies to "all civil actions" not subject to a more specific venue statute. 28 U.S.C. § 1391(a)(1); *Atl. Marine Constr. Co. v. United States Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 55 n.2 (2013). Pursuant to § 1391, venue may be laid in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." Id. at § 1391(b)(1).

Defendants argue this Court should dismiss the Second Amended Complaint as to plaintiffs City of Huntington and Cabell County pursuant to Rule 12(b)(3) and 28 U.S.C. § 1391(b)(2)[14] because both plaintiffs have already asserted claims alleging the same harm in another venue and alleged that a "substantial part of the events or omissions happened" there—in the Southern District of West Virginia. [Doc. 109 at 39–40]. This Court disagrees.

Defendants assert that plaintiffs City of Huntington and Cabell County received an adverse ruling on their public nuisance claim in the Southern District of West Virginia. *See City of Huntington*, 609 F.Supp.3d 408.  Because of this adverse ruling, plaintiffs

---

[14] 28 U.S.C. § 1391(b)(2) reads in full: "A civil action may be brought in-- (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

"gamesmanship to avoid adverse law from a case they were party to and that was litigated for year in another district should not be countenanced." [Doc. 109 at 39]. However, as noted *supra*, the Fourth Circuit certified a question regarding West Virginia public nuisance law to the Supreme Court of Appeals of West Virginia in *City of Huntington, West Virginia v. AmerisourceBergen Drug Corp.*, No. 22-1819 (4th Cir. Mar. 18, 2024). This Court will not dismiss plaintiffs City of Huntington and Cabell County's  public nuisance claim at this time and defers ruling on any public nuisance arguments until the certified question is answered.

Defendants further argue that because plaintiffs cannot assert a valid RICO claim, such a claim cannot establish venue. However, as noted *supra*, even though this Court is dismissing the RICO claim in the Second Amended Complaint, this Court is not required to rely solely on the RICO claim to establish venue.

Venue is proper under 18 U.S.C. § 1965(a)–(b).[15] The fact that plaintiffs City of Huntington and Cabell County previously alleged that a substantial part of the events may have also occurred in the Southern District of West Virginia does not defeat venue. *McClure v. Manchin*, 301 F.Supp.2d 564, 569 (N.D. W.Va. 2003) (Keeley, J.) ("Although a civil action could be brought in the Southern District under § 1391(b)(1)—and perhaps

---

[15] 18 U.S.C. § 1965(a)–(b) reads in full:
(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.
(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

§ 1391(b)(2) also—proper venues are not mutually exclusive. Indeed, venue is subject to the choice of the plaintiffs, not the defendant.").  Plaintiffs have made a prima facie showing of proper venue in order to survive defendants' Motion to Dismiss.  Construing all factual allegations in favor of plaintiffs and under 18 U.S.C. § 1391(b)(2), venue is appropriate in the Northern District because a substantial part of the events giving rise to the claims occurred here.  Thus, this Court **DENIES** defendants' Motion regarding their argument that plaintiffs City of Huntington and Cabell County are improperly forum-shopping.

## IV.    Conclusion

For the foregoing reasons and in summary,

- This Court finds that plaintiffs' claims are not time-barred as a matter of law on the face of the Second Amended Complaint.  Defendants' Motion is **DENIED** regarding the issue of timeliness.

- This Court will **GRANT** defendants' Motion as it pertains to plaintiffs' RICO claim for injunctive relief.  Thus, plaintiffs' RICO claim is hereby **DISMISSED** from the Second Amended Complaint to the extent that it seeks injunctive relief.  Plaintiffs are permitted to pursue only treble damages and costs.

- This Court finds that ERISA does not preempt plaintiffs' claims.  Defendants' Motion is **DENIED** regarding the issue of ERISA preemption.

- This Court finds that Medicare Part D does not preempt plaintiffs' claims.  Defendants' Motion is **DENIED** regarding the issue of Medicare Part D preemption.

- This Court will **DENY** defendants' request to stay the above-styled case and hereby **DEFERS RULING** on plaintiffs' First Claim for Relief, Common Law Public Nuisance, pending argument on the certified question in *City of Huntington and Cabell County Commission v. AmerisourceBergem Drug Corp., et al.*, No. 24-166.  Defendants are **DIRECTED** to file a new Motion to Dismiss with respect to plaintiffs' First Claim for Relief, Public Nuisance, within **fourteen (14) days** following the Supreme Court of Appeals of West Virginia's decision in *City of Huntington and Cabell County Commission v. AmerisourceBergem Drug Corp., et al.*, No. 22-1819. Upon receipt of defendants' Motion to Dismiss, plaintiffs are **DIRECTED** to respond within **fourteen (14) days**.  Any Reply briefing is due within **seven (7)** days upon receipt of any Response.

- This Court **DENIES** defendants' Motion regarding plaintiffs' Third Claim for Relief.

- This Court **GRANTS** defendants' Motion regarding their request to dismiss plaintiffs' claim for gross negligence.   Insofar as the Second Amended Complaint asserts a claim for gross negligence, the same is **DISMISSED**.

- This Court **DENIES** defendants' Motion regarding plaintiffs' Fifth Claim for Relief.

- This Court **DENIES** defendants' Motion regarding their argument that plaintiffs failed to state a claim against miscellaneous entities.

- This Court **DENIES** defendants' Motion regarding their argument that Rule 41 bars plaintiff City of Huntington's claims against ESI and EHI.

- This Court **DENIES** defendants' Motion regarding their argument that plaintiffs City of Huntington and Cabell County are improperly forum-shopping.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: December 23, 2024.


JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE